```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
TBC CONSOLES, INC.,_____          |
                                    |
                 Plaintiff,         |
                                    |
     -against-                      |   05 Civ. 2756 (KMW) (KNF)
                                    |
                                    |
FORECAST CONSOLES, INC.,            |
                                    |
                 Defendants.        |
------------------------------------x
FORECAST CONSOLES, INC.,            |
                                    |
                 Plaintiff,         |
                                    |
     -against-                      |   07 Civ. 3106 (KMW) (KNF)
                                    |
                                    |   OPINION AND ORDER
TBC CONSOLES, INC., et al.,         |
                                    |
                 Defendants.        |
------------------------------------x
KIMBA M. WOOD, U.S.D.J.:
```

     In this consolidated action, Forecast Consoles, Inc.
("Forecast") alleges that TBC Consoles, Inc. ("TBC") infringed
certain of its patents directed at the manufacture of a fully
adjustable multimedia workstation.

     The parties dispute the meaning of five terms found in
certain of the claims of the relevant Forecast patents:  (1)
"finger"; (2) "longitudinal slot"; (3) "disposed at a downward
angle with respect to [another object]" and "formed at a downward
angle with respect to [another object]"; and (4) "first and
second upper mounting portions."  Pursuant to Markman v.

1

Westview, 517 U.S. 370 (1996), the construction of claim terms is a question of a law for the court.

After reviewing the parties' submissions, the Court finds no separate Markman hearing is necessary.  The paper record, the parties agree, provides the Court with the information necessary to construe the claim terms.  See CIAS, Inc. v. Alliance Gaming Corp., 424 F. Supp. 2d 678, 682 (S.D.N.Y. 2006); Interactive Gift Exp., Inc. v. Compuserve Inc., 47 U.S.P.Q.2d 1797, 1799 n.3 (S.D.N.Y. 1998), vacated on other grounds, 256 F.3d 1323 (Fed. Cir. 2001); see also Key Pharm. v. Hercon Labs. Corp., 161 F.3d 709, 716 (Fed. Cir. 1998).  The Court's construction of the five disputed claim terms follows.


**BACKGROUND**

I.   FACTS

     A.   The Parties

Forecast and TBC are both engaged in the manufacture and sale of technical furniture, comprised primarily of workstations designed for use in the broadcasting industry.

     B.   The Patents at Issue

There are three patents at issue:  U.S. Patent Nos. 6,857,712 (the "'712 patent"); 7,125,088 (the "'088 patent"); and 7,406,803 (the "'803 patent") (collectively, the "Forecast patents").  The '712 patent is the original patent, issued by the

Patent and Trademark Office ("PTO") on February 22, 2005.  The
applications for the '088 and '803 patents were filed as
continuation or divisional applications of the original
application that matured into the '712 patent.

The Forecast patents are directed at a "multi-media
workstation," which uses a "master rail system" for permitting
the "full horizontal adjustment of the various components of the
workstation."  ('712 patent; col. 1, lines 10-15.)  Each of the
patents contain the same written descriptions and the same
drawings of the patented invention, except for minor
typographical errors.

C.   <u>Background of the Invention</u>

As described in the patent documents, the type of
workstation contemplated by the Forecast patents is typically
found at control centers for monitoring and controlling
audiovisual equipment (<u>e.g.</u>, in television studios and air
traffic control centers).  These workstations are, the patent
documents contend, typically custom built and installed by the
manufacturer based on the user's particular requirements.  If it
later becomes necessary to expand the workstation or rearrange
its components, the workstation has to be rebuilt or replaced.
Thus, the Forecast invention is aimed at providing a flexible
modular workstation that can be easily adjusted and re-arranged.

D.   <u>Summary of the Invention</u>

The Forecast invention is entitled "Multi-Media Workstation Having a Master Rail System."  The workstation includes a console, which has two main components:  a work surface and a "master rail system."  The master rail system, which runs along the full length of the console, is intended to support and translate the various audiovisual equipment (such as computers, computer monitors, and television monitors), which are mounted along the length of the console.

The master rail system is compromised of two support structures called "rail extrusions."  The two rail extrusions are mounted along a number of vertical steel frames spaced at intervals along the length of the console.  The Forecast patents teach that the second rail extrusion is mounted to the vertical frames such that "the upper surface of the second rail extrusion is disposed at a downward angle with respect to the upper surface of the first rail extrusion."

For example, in a preferred embodiment,[1] a desktop unit is mounted to the first rail extrusion and a console box (for supporting a second piece of audiovisual equipment) is mounted to the second rail extrusion.  In this arrangement, the console box is, for ergonomic purposes, thereby "oriented at a slight

---

[1]   As set forth in greater detail below, a "preferred embodiment" is an example of how to practice the patented invention, and often, what the patentee understands as the best mode for doing so.

4

downward angle with respect to the desktop."

The various components of the workstation (e.g., the desktop unit and console box above) each include a "finger," which engages a "longitudinal slot," appearing on the upper, or lateral, surfaces of either the first or second rail extrusion. This engagement permits the component to be translated horizontally along the length of the rail extrusion (that is, along the full length of the console) as desired.

E.    Claim Terms

As part of the claim construction in this case, the parties submitted a Joint Claim Construction Chart, outlining both agreed upon and proposed definitions of certain terms found in certain of the Forecast claims.  The parties agreed upon definitions for the terms "lateral surface," "upper mounting surface," and "console box."

The parties, however, dispute definitions of the claim terms (1) "finger"; (2) "longitudinal slot"; (3) "disposed at a downward angle with respect to" as well as "formed at a downward angle with respect to"; and (4) "first and second upper mounting portions."

II.  Procedural History

On March 10, 2005, TBC Consoles brought an action seeking a declaratory judgement that its IntelliTRAC model workstation did not infringe the Forecast patents.  On December 12, 2005, this

5

Court ordered a stay of the proceedings pending resolution of the re-examination of the Forecast patents by the Patent Office.

On March 17, 2007 Forecast filed an action against TBC for patent infringement, trademark infringement, and unfair competition based upon the alleged similarity of TBC's multimedia workstations to Forecast's patented designs and trade dress.[2]  On August 11, 2008 this Court lifted the stay, and subsequently granted the parties' joint request to consolidate the two related actions.

Pursuant to a revised scheduling order, the parties filed simultaneous initial and reply claim construction briefs on October 24, 2008 and November 4, 2008 respectively.  Forecast, as the owner of the patents, seeks a broad construction of the claim terms, and TBC, as the maker of the accused device, seeks a narrow construction.  The Court's decision on claim construction follows.


**DISCUSSION**

I.   APPLICABLE LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  Phillips v. AWH Corp., 415 F.3d 1303,

---

[2] By an order dated July 27, 2009, Magistrate Judge Fox, inter alia, granted Forecast's motion to amend its complaint to include the '803 patent in its patent infringement claim.

1322 (Fed. Cir. 2005) (en banc) (internal quotations omitted).

Claim construction presents a question of law for the court, Markman, 517 U.S. at 384, 390-91, and its purpose is to determine what is, and what is not, covered by the terms of a patent. "The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." Embrex, Inc. v. Service Eng'g Corp., 216 F.3d 1343, 1347 (Fed. Cir. 2000).

In construing the claims, courts should look primarily to the intrinsic evidence, including (1) the claim language itself, (2) the specification of the patented invention, and, (3) if in evidence, the prosecution history. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Intrinsic evidence is the "most significant source" in ascertaining the "legally operative meaning of disputed claim language," id., and constitutes "the public record" of the patent "on which the public is entitled to rely," id. at 1583.

The Federal Circuit has recognized that, in certain circumstances, extrinsic evidence may be helpful to courts in claim construction.[3]  Phillips, 415 F.3d at 1317-18.  However, reliance on extrinsic evidence is improper where the public

---

[3] Extrinsic evidence is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317 (internal quotations omitted).

record of the patent unambiguously describes the scope of the patented invention, and where the intrinsic evidence is sufficient to resolve the meaning of a disputed term. <u>Vitronics</u>, 90 F.3d at 1583.

    A.  <u>Claim Language</u>

Courts look to the "words of the claims themselves . . . to define the scope of the patented invention." <u>Vitronics</u>, 90 F.3d at 1582.  A claim term is presumed to possess its "ordinary and customary meaning," <u>id.</u>, which in the patent context, is the "meaning the term would have to a person of ordinary skill in the art in question at the time of the invention," <u>Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.</u>, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

Courts do not look to the ordinary meaning of claim terms in isolation. <u>Medrad, Inc. v. MRI Devices Corp.</u>, 401 F.3d 1313, 1319 (Fed. Cir. 2005).  A person of ordinary skill in the art is deemed to read the claim term in the context of the particular claim in which the disputed term appears, and in the context of the entire patent, including its specification. <u>Phillips</u>, 415 F.3d at 1313.[4]

_____

[4] Courts may also consider dictionary definitions "to assist in understanding the commonly understood meaning of words." <u>Phillips</u>, 415 F.3d at 1322.  The Federal Circuit has cautioned, however, that reference to dictionary definitions, a form of extrinsic evidence, is appropriate only "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." <u>Id.</u> at 1322-23.

B.   Patent Specification

The patent specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive . . . [as] it is the single best guide to the meaning of a disputed term."[5]  Phillips, 415 F.3d at 1315; see On Demand Mach. Corp. v. Ingram Indus., 442 F.3d 1331, 1337-38 (Fed. Cir. 2006) ("[T]he court in Phillips, resolving conflict, stressed the dominance of the specification in understanding the scope and defining the limits of the terms used in the claim.")

Claim terms must be construed consistent with and in light of the specification.  As stated by the Federal Circuit, "the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim."  Phillips, 415 F.3d at 1316 (quoting Reinshaw PLC v. Marposs Societa per Azonia, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  The

---

"[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification."  Id. at 1321.

[5] The specification, as explained in Section 112 of the Patent Act, is a "written description of the invention, and of the manner and process of making and using it, in such full, clear and concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . ."  35 U.S.C. § 112; see Phillips, 415 F.3d at 1311; see also id. at 1323 (explaining that the specification is meant to "teach and enable those of skill in the art to make and use the invention and to a provide a best mode for doing so").

construction that "stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the proper construction." Id.

Courts must also, however, "avoid the danger of reading limitations from the specification into the claim." Phillips, 415 F.3d at 1323.  The specification "describes very specific embodiments of the invention," the Federal Circuit has "repeatedly warned against confining the claims to those embodiments." Id.; see also id. ("[P]ersons of ordinary skill in the art would rarely confine their definition of terms to the exact representations depicted in the embodiment.")

There is, the Federal Circuit has recognized, "sometimes a fine line between reading a claim in light of the specification and reading a limitation into the claim from the specification." Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186-87 (Fed. Cir. 1998).  The court's task is to determine whether a person of skill in the art would understand the embodiments as "merely . . . exemplary in nature" or "to define the outer limits of the claim term." Phillips, 415 F.3d at 1323.

C.   Prosecution History

Courts also examine the prosecution history – the complete record of all proceedings before the PTO – including any "express representations made by the applicant regarding the scope of the claims." Vitronics, 90 F.3d at 1582.  The prosecution history

10

limits the interpretation of claim terms to exclude any interpretation that was unambiguously disavowed or disclaimed during the patent prosecution (presumably, to overcome the prior art and obtain the patent).[6] Rheox, Inc. v. Entact, Inc., 276 F.3d 1319, 1325 (Fed. Cir. 2002); see also Springs Window Fashions LP v. Novo Indus. LP, 323 F.3d 989, 995 (Fed. Cir. 2003) ("[T]he public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent."). However, because the prosecution history "represents an ongoing negotiation between the [PTO] and the applicant . . . it often lacks the clarity of the specification and is thus less useful for claim construction purposes." Phillips, 415 F.3d at 1317.

## II. ANALYSIS

The parties dispute the meaning of five claim terms: (1) "finger"; (2) "longitudinal slot"; (3) "disposed at a downward angle with respect to" and "formed at a downward angle with respect to"; and finally (4) "first and second upper mounting portions." Specifically, the parties disagree, in the context of the Forecast patents, whether:

---

[6] Where, as here, "multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." Elkay Mfg. v. Ebco Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999).

(1) a "finger" must be, as TBC contends, an integrated part of the object from which it projects;

(2) a "longitudinal slot" formed within the rail extrusion must be, as TBC contends, "narrow" with an "essentially flat bottom" and "upstanding sidewalls";

(3) the phrase "[disposed/formed] at a downward angle with respect to [another object]" refers to the relative <u>position</u> of the object, as Forecast contends, or to its relative angle of <u>incline</u>, as TBC contends;[7]

(4) the phrase "first and second upper mounting portions," which refers to the upper mounting surfaces of the vertical steel frames, includes (as TBC contends) the same "downward angle" limitation described above.

As set forth below, the Court concludes that (1) the claim terms (a) "finger" and (b) "longitudinal slot" are not limited to the preferred embodiments set out in TBC's proposed definitions; that (2) the "downward angle" limitation refers to <u>both</u> the relative position and the relative angle of incline of an object; and finally, that (3) the upper mounting portions of the vertical steel frames do not include a limitation on their relative position and/or angle of incline.

---

[7] Again, here the "downward angle" limitation refers to the position and/or incline of the "upper surface of the second rail extrusion with respect to the upper surface of the first rail extrusion."

A.    "Finger"

1.    Parties' contentions

The patent documents describe the various components of the workstation as having a "finger" that engages longitudinal slots along the rail extrusions to support the component and to permit its horizontal adjustment along the length of the console.

TBC proposes that "finger" be defined as:  "A member, projecting from and part of a first object and designed to interface with a second object so as to limit or direct movement of the first object with respect to the second object."

Forecast agrees with TBC that a "finger" is "[a] member that projects from the a first object to effect, direct, or restrain motion when brought into contact with the second object." Forecast, however, rejects that part of TBC's proposal, which limits the definition of "finger" to a member that must be "part of" the first object.  Instead, Forecast proposes that the definition of "finger" be clarified to provide that a "finger may be formed integrally with the first element or may be permanently or removably fitted thereto or therethrough."[8]

The parties thus disagree as to whether a finger must not only project from the first object, but must also be an integrated part thereof.  As set forth below, the Court discerns

_____

[8] The parties use the example of a removable "bolt" to give content to this latter concept.

13

no such limitation on the meaning of "finger" in the context of the Forecast patents.[9]

### 2.   Intrinsic evidence

#### a.   Claim language

The term "finger" is found in claims 1, 6, 8, 9, 13, 15 of the '712 patent; claims 1, 5, 7, 9, 11, 12 in the '088 patent; and claims 1, 7, 9, 11, 13 of the '803 patent.  The language in those claims dictates that a "finger" is (1) a member that projects from the first object (often, a component); (2) which engages a longitudinal slot found on the second object (here, the rail extrusion); (3) so as to support the component and to permit its horizontal adjustment along the length of the console.  The claim language does not suggest, much less require, that a finger must also be "part of" the component object from which it projects.

#### b.   Specification

The Court next turns the Forecast patents' specification. TBC argues that the Forecast patents' specification demonstrates an intention to limit the definition of finger to a device that must be part of the object from which it projects.  According to

_____

[9] Forecast and TBC both assert in their memorandums that it is unnecessary for the Court to consider extrinsic evidence in construing the claim terms.  The Court agrees, and does not find particularly helpful in its analysis either the general usage dictionary definition of "finger" submitted by Forecast or the "Bosch" product catalogue submitted by TBC as part of the parties' claim construction papers.

TBC, the patents' illustrations represent a finger as a
physically integrated member, not as a member that must be fitted
or fastened to the component object.  According to TBC, a
physically integrated finger is not merely a preferred embodiment
of the Forecast invention, it is its only intended embodiment.
The Court disagrees.

The Federal Circuit has expressly rejected the contention
that "if a patent describes only a single embodiment, the claims
of the patent must be construed as being limited to that
embodiment."  Phillips, 415 F.3d at 1323; see Liebel-Flarsheim
Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004)
(collecting cases).  The question instead is whether the patentee
intends for the embodiment to define the outer limits of the
claim term.  Phillips, 415 F.3d at 1323.  As set forth below, the
Court discerns no such intention from the patent documents.

First, TBC is, in any case, incorrect that the Forecast
patents strictly limit the concept of a "finger" to an integrated
member.  Claim 9 of the '088 patent recites that a vertical
support stand - used for horizontally translating a piece of
audiovisual equipment, such as a monitor, along the length of the
console - has a "finger" engaged in a longitudinal slot on the
upper surface of the first rail extrusion.  The disclosed
structure for supporting the vertical support stand is a T-shaped
"bolt", which, the parties agree, is the paradigm for a non-

integrated (that is, permanently or removably fitted) member.
TBC's proposed definition of finger would <u>exclude</u> the Forecast
patents' preferred embodiment of the device used to attach the
vertical support stand recited in claim 9.[10]  Such a
construction, the Federal Circuit teaches, is "rarely, if ever,
correct."  <u>Vitronics</u>, 90 F.3d at 1583.

Finally, when read as a whole, the Forecast patents do not
disclose an intention that TBC's proposed limitation be a part of
every embodiment.  The premise of the Forecast patents are that
"in all embodiments" the components of the workstation are
"mounted to the master rail system to permit their horizontal
adjustment along the length of workstation."  ('712 patent; col.
4, lines 7-10.)  The specification's detailed description of the
invention does not suggest that this adjustment is always or
necessarily accomplished by a finger that is part of the
component object.[11]  The "very character of the invention" does

_____

[10]  The specification in relevant part recites that the
"vertical support stand [76] includes a leg [78] having a T-shaped
finger or fitting <u>[70]</u> fixed thereto, for example, by a bolt."
(Col. 7, lines 9-12 (emphasis added).)  The number "70" is a typo,
however, as the "T-shaped finger or fitting" referred to is the
structure labeled as "80" in the relevant drawing.  (Fig. 4.)

[11]  The Federal Circuit's analysis in <u>Toro Company</u> does not, as
TBC contends, indicate a contrary result.  In <u>Toro Company v. White
Consol. Indus., Inc.</u>, 199 F.3d 1295, 1300-01 (Fed. Cir. 1999), the
specification and drawings of the patent at issue showed a
restriction ring as "part of" and "permanently attached to" the air
the blower cover at issue.  The court found that the patent
required the cover and ring be a single component.  But, in doing
so, the court relied on the specification, which described the

16

not require the finger to be so constructed.  Alloc, Inc. v.
Int'l Trade Comm'n, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("[T]his
court looks to . . . whether the specification read as a whole
suggests that the very character of the invention requires the
limitation to be a part of every embodiment."); see Sunrace Roots
Enter. Co. v. SRAM Corp., 336 F.3d 1298, 1305 (Fed. Cir. 2003)
(recognizing that although "the patentee was primarily focused on
an [particular] embodiment of the invention . . . , nothing in
the patent limits the claims to that embodiment").

The very character of the Forecast invention requires only
that a member finger project from the component and engage a
longitudinal slot, to support the component and permit its
horizontal adjustment.  Thus, the Court construes "finger" to
mean: "A member that projects from a first object to effect,
direct, or restrain motion when brought into contact with a
second object.  A finger may be formed integrally with the first
object or may be fitted thereto or therethrough."[12]

---

restriction ring as "buil[t] . . . as part of the air inlet cover,"
and further described "the advantages of the unitary structure as
important to the invention." Id.  Here, the specification does
not describe the "finger" as part of the component, nor does it
describe any of the perceived benefits of such a unitary structure.

[12] The Court notes that this definition eliminates certain
aspects of the Forecast proposal that could inject unnecessary
ambiguity into the definition; namely, its use of the word
"element" in place of "object," and its use of the adverbs
"permanently or removably" to modify "fitted" in the definition's
last sentence.

      B.   "Longitudinal Slot"

      TBC proposes that the claim term "longitudinal slot"[13] be
defined as:  "A narrow channel with an essentially flat bottom
and upstanding side walls formed within an extrusion or rail and
extending along a length of the extrusion or rail."  Forecast
rejects TBC's proposal that a longitudinal slot must be "narrow"
and have "an essentially flat bottom and upstanding side walls."
Instead, Forecast proposes that "longitudinal slot" be defined
as:  "A slot formed within an extrusion or rail and extending
along the length of the extrusion of rail."  As set forth below,
the Court agrees with Forecast, as TBC's construction
impermissibly imports limitations from a mere preferred
embodiment into the claim term.

      TBC appears to be arguing that the definition of
longitudinal slot should be limited to something akin to the "T-
shaped slots" disclosed throughout the specification.[14]  (Such
slots generally have a flat bottom and upstanding side walls.)

_____

      [13] The term "longitudinal slot" is found in claims 1, 6, 7, 8,
9, 13, 14, and 15 of the '712 patent; claims 1, 5, 6, 7, 9, 10, 11,
and 12 of the '088 patent; and claims 1, 2, 3, 4, 5, 7, 9, 11, 13,
15, 16, 17, 18, 19, and 20 of the '803 patent.

      [14] The Court notes that certain aspects of TBC's proposed
definition are vague.  Even if the Court were to agree with the
substance of TBC's proposed limitation, it would be difficult to
apply such requirements as an "essentially" flat bottom or a
"narrow" channel to an accused device.

18

The specification, however, is clear that a T-shaped slot is merely a "preferred" embodiment of the Forecast patents; it does not constitute an outer limit of the claim term.

First, both the claims and the specification refer to longitudinal slots that "preferably <u>are</u> T-shaped" or simply to "T-shaped" longitudinal slots.  ('712 patent; col. 3, lines 2-3; Claims 7 & 14).  The use of T-shaped to modify the claim term longitudinal slots thus suggests that the meaning of longitudinal slot, standing alone, is not so confined.  <u>See</u> <u>Phillips</u>, 415 F.3d at 1324 (finding that claim language providing that "baffles" may be "oriented with panel sections disposed at angles" to defect incoming projectiles, makes it likely that the patentee did not contemplate the term "baffles" already contained that specific limitation).

Second, when read as a whole, the Forecast patents do not disclose an intention to limit the longitudinal slots to a specific shape or size.  The specification itself recites that various fingers must be "sized to fit within and engage" the relevant longitudinal slots - suggesting that not all slots have the same simple narrow structure proposed by TBC.  ('712 patent; col. 5, lines 64-66.)  And TBC points to no evidence from the prosecution history to suggest that Forecast relied on any specific shape or size for the longitudinal slot to overcome the prior art.

The very character of the invention requires that a "finger" sufficiently engage a "longitudinal slot" to support the component and permit its horizontal adjustment; it does not require either to be (as explained above) the particular type or shape disclosed in the specification as the patentee's preferred construction.  Thus, the Court agrees with Forecast's proposed definition and defines longitudinal slot as:  "A slot or channel formed within an extrusion or rail and extending along a length of the extrusion or rail."


C.   <u>"Disposed at downward angle with respect to [another object]"/"Formed at a downward angle with respect to [another object]"</u>

The parties also dispute the meaning of the phrases "disposed at/formed at a downward angle with respect to [[another object]]."[15]

The claim language details that the upper surface of the second rail extrusion is "disposed at a downward angle with respect to" the upper surface of the first rail extrusion.[16]  The Forecast patents' drawings show (see Figure 4 attached) that:

_____

[15] The parties each propose identical definitions for the two phrases, and therefore appear to interpret "disposed at" and "formed at" in the context of the claim terms <u>in pari materia</u>.  The Court follows the parties' approach.

[16] "Disposed at a downward angle with respect to" is found in claim 1 of the '712 patent and claim 10 of the '088 patent; "formed at a downward angle with respect to" is found in claim 9 of the '712 patent and claim 1 of the '088 patent.

first, the position of the upper surface [47] of the second rail
extrusion [42] as vertically lower and to the right of the upper
surface [41] of the first extrusion [40],[17] and second, that the
upper surface [47] of second rail extrusion [42] is itself
inclined at a downward angle with respect to (that is, sloping
downward from) the upper surface [41] of the first rail extrusion
[40] (which is represented as a flat surface).
('712 patent; Fig. 4 (attached).)

TBC proposes a definition of the downward angle limitation
that, although difficult to interpret, appears to be directed
mainly at the latter concept (an inclined surface), and Forecast
proposes a definition that is stated in the alternative to
encompass either concept (a positional relationship or an
inclined surface).[18]

The disputed claim term is not a model of clarity, but the

---

[17] In its memorandum, TBC contends that there can be no "left
or right" from the first extrusion because the rail extrusion runs
along the entire length of the workstation.  TBC misunderstands
Forecast's (and hereafter the Court's) use of "left or right" here.
Here "left or right" to refer to the position of each extrusion in
a cross-sectional view (when viewed from the side).  Thus, to say
that the second extrusion is below and to the right of the first
extrusion, is the same as saying that the second extrusion is below
and behind the first extrusion when facing the workstation (when
viewed head on).

[18] By stating the definition in the alterative, Forecast
proposes a construction that would substantially broaden the scope
of its claims to include a device that maintained either feature.
As set forth below, the Court rejects Forecast's construction
because the disputed phrase, the Court concludes, speaks at least
in part to an "inclined" orientation of the object.

21

Court concludes that the best construction is one that, as set out below, encompasses <u>both</u> concepts:  that the upper surface of the second rail extrusion is inclined with respect to surface of the first rail extrusion, and that it is in a position vertically lower than the first.

The claim language here offers little in the way of elaboration.  But the specification's description of the invention is helpful in providing the necessary context for the Court's construction.  It states in relevant part:

> Preferably, the top of the steel frame is <u>inclined</u> so that the <u>upper surface of the second rail extrusion is disposed at a downward angle with respect to the upper surface of the first rail extrusion</u> when both are mounted to the steel frames.  Thus, when mounted to the second rail extrusion, the <u>console box will be oriented at a slight downward angle with respect to the desktop</u> for ergonomic purposes.

('712 patent; col. 6, lines 64-67; and col. 7, lines 1-4 (emphasis added).)  The use of the phrase "downward angle with respect to" in this part of the specification lends support to a definition that refers in part to an angle of incline.  First, as provided in this preferred embodiment, when the second rail extrusion is mounted atop an inclined steel frame, the upper surface of the second rail extrusion will be <u>both</u> inclined, and below and to the right of, the upper surface of the first extrusion.  Second, Forecast concedes in its memorandum that the "downward angle" limitation in the patents' description of the console box above refers at least in part to its inclined

22

orientation.  Such an orientation is "thus" assured if the surface of the second rail extrusion is also oriented at an incline.

The Court notes that the relative angle of incline of the second rail extrusion (and in this case the console box supported thereon) is not an insignificant detail in the specification, but instead, plays a substantial part in the invention:  if the console box were not oriented at an incline (as in the attached Figure 3) then the user of the workstation could not, at the same time, see a screen that was simply below (and behind) the desktop unit.  ('712 patent; Fig. 3 (attached).)  It is, in other words, the relative angle of incline that permits the workstation's ergonomic set up.

Finally, the prosecution history also supports the Court's construction.  As noted above, the Forecast patents were re-examined at the request of TBC.  In its submissions, Forecast explicitly relied on the "downward angle" limitation as distinguishing the prior art.  Forecast's invocation of the exact claim language sheds little light on its meaning.  However, the Court notes that the Statement of the Examiner also referred to the second extrusion as itself having "angled surfaces."  (Defs. Reply, Ex. C.)  The examiner understood that not only the position of the surface was at some relative angle, but that the

surface itself was also angled or inclined.[19]

Thus, the Court construes the phrases "[disposed/formed] at a downward angle with respect to [another object]" as:  "Disposed in location below and to the left or right of the other object and having a greater angle of incline than the other object."


D.   "First and Second Upper Mounting Portions"

The phrase "first and second upper mounting portions" is found only in Claim 6 of the '803 patent, and refers to the upper mounting surfaces of the top of the steel frames.  TBC's proposed construction seeks to incorporate the same "downward angle" limitation described above into the definition of the claim term.  Specifically, TBC proposes the claim term be defined as:  "A first mounting portion comprising a first surface on the vertical frames and a second mounting portion comprising a second surface on the vertical frames inclined at a downward angle in relation to the first surface."  As set forth below, the Court rejects

_____

[19] The Court notes that Claim 9 of the '088 patent, in describing an alternative structure for the rail extrusion, refers to a second "inclined surface," that is "disposed at a downward angle" with respect to a first surface.  Forecast thus argues that "downward angle" must mean something other than "inclined," because that term is already used to describe the orientation of the surface.  The Court concludes, however, that the reference to "inclined" in the claim language is best understood as a case of duplicative draftsmanship, rather than a true case of the claim term's differentiation.  It should not, in any case, trump what is, in the context of the entire patent record, the better fitting construction.

TBC's proposed construction.

The specification describes the top of the steel frame as "preferably" inclined, so that the upper surface of the second rail extrusion, when mounted, will be (automatically) disposed at a downward angle with respect to the upper surface of the first rail extrusion.  There is nothing in the claim language of the '803 patent or the common specification to suggest that this preferred embodiment of the steel frames should constitute the outer limits of its construction.  In other words, there is nothing to suggest that in all embodiments of the invention, the first and second mounting portions of the steel frame must be disposed at any relative angle of incline.  TBC has provided no persuasive reason for importing a downward angle limitation into the definition of the upper mounting portions of the steel frames in the '803 patent, particularly where that limitation is not found in the claims of either the earlier '088 or '712 patents.

Thus, the Court adopts Forecast's proposed construction of "first and second upper mounting portions":  "First and second portions of a top of the vertical frames to which an object may be mounted."


**<u>CONCLUSION</u>**

The Court's construction of the disputed claim terms is set out above.  In accordance with the Court's February 11, 2009

25

Order, any motion for summary judgment must be filed no later than 40 days subsequent to the date of this decision on claim construction.

SO ORDERED.

Dated:    New York, New York
          September 28 , 2009

_Kimba M. Wood_
Kimba M. Wood
United States District Judge

26

Case 1:05-cv-02756-KMW-KNF   Document 34   Filed 09/29/09   Page 27 of 28



FIG. 4

Case 1:05-cv-02756-KMW-KNF    Document 34    Filed 09/29/09    Page 28 of 28





FIG. 3